197 A.2d 469 (1964)
In re the ADOPTION OF John DOE.
Orphans' Court of Delaware, New Castle.
February 21, 1964.
*470 Thomas G. Hughes, Wilmington, for petitioner, an Adoptive Agency of the State of Delaware.
Daniel F. Kelleher, Wilmington, for respondent, Mary Doe.
Sidney Clark, Wilmington, for respondent, Robert Doe.
McNEILLY, Judge.
This matter arises by reason of a Motion filed by an Adoptive Agency of the State of Delaware in the following words, to-wit:
"The Adoptive Agency (name of Agency deleted) moves the Court to set aside the Decree of Adoption entered on July 26, 1963 and to deny the said Robert Doe and Mary Doe adoption of the said John Doe, a minor, on the grounds that the said Robert Doe and Mary Doe did fraudulently fail to reveal and did misrepresent certain material facts as to their qualifications to properly maintain, care for and educate the said minor; and that as a result of said fraudulent conduct it is not in the best interest of said child to be adopted by the said Robert Doe and Mary Doe, and that had the said Adoptive Agency been aware of the true facts concerning the qualifications of the said Robert Doe and Mary Doe it would not have granted its consent to the aforementioned adoption. Attached hereto as Exhibit A. is the Affidavit of the Director of the Adoptive Agency (Name of Director deleted)."
In support of this Motion an Affidavit was attached thereto made by the Director of the Agency in the following language, to wit:
"(1) I am the Director of ... (Adoptive Agency) and among my duties am charged with overseeing the adoption policies, investigations and recommendations made by the Agency, an authorized Agency under 13 Del.C. Ch. 9.
"(2) Social workers under my supervision prepared the customary investigation into the background and fitness of Robert Doe and Mary Doe, husband and wife, who wished to adopt an infant child through an Adoptive Agency of the State of Delaware.
"(3) No information was discovered which indicated that the Does were not morally and economically fit to be adoptive *471 parents prior to July 26, 1963 by the Adoptive Agency or its Agents.
"(4) However, it has later been discovered that Mary Doe left the marital home on or about August 21, 1963 and on information and belief Mary Doe took up residence in Dover, Delaware with a Mr. Richard Roe, a former neighbor of Mary Doe.
"(5) On information and belief the home life represented to the Social Workers of the Adoptive Agency by the Does was deliberately falsified for the Does put on a display of domestic tranquility when in fact their home was not stable or conducive to proper adoption.
"(6) On information and belief the moral conduct of Mary Doe prior to the Final Decree and after the Final Decree makes her an unfit person to be an adoptive parent.
"(7) In light of the information obtained the Adoptive Agency would not have consented to the adoption of John Doe by Robert Doe and Mary Doe, his wife."
The Respondents, Robert Doe and Mary Doe, were married on May 18, 1957 and at the time of the hearing in this matter Mr. Doe was thirty-two years of age and Mrs. Doe was twenty-five years of age.
Mrs. Doe was one of a family of ten children, and her husband, whose Mother died when he was eight months old, and whose Father remarried at the then age of twenty, was raised by his paternal Grandmother and never had the benefit of a Father except for a very short period of time after his Grandmother's death.
Following the Doe's marriage they attempted on many occasions to have children, but it was learned early in their married life that Mrs. Doe was unable to have children although on one or more occasions she had thought she was pregnant and had proudly indicated that fact to family gatherings at Christmas time which was in accordance with family custom. As a matter of fact, Mr. and Mrs. Doe were so disappointed that they could not have children and so desirous of having children that she spent almost three years having medical tests and going through medical treatment in an effort to correct the unhappy situation. All of this was to no avail, however, and on February 4, 1960 Mrs. Doe first contacted the Adoptive Agency, a licensed Adoptive Agency in the State of Delaware, concerning the possibility of adopting a child. Since the present Petition is based upon fraud on the part of Mr. and Mrs. Doe in obtaining the ultimate consent of the Adoptive Agency to the adoption in question it becomes pertinent to quote a part of this letter as follows:
"My husband and I will be married three years May 18, 1960. To some people this doesn't seem like such a long time, but to us it is an eternity. We hoped we would be able to start a family right away. We didn't stop to think that we would ever have any trouble. It seems, as the time goes by, we just grow a little more disappointed. We talked about adopting a baby, and have decided that an adopted baby can make us as happy, as if we had our own. * * * We are both very fond of children, that is why it is so important for us to have a family. We are buying a new home, and plan to move in April. A home is for a family to share, so we feel we cannot be entirely happy in one, unless children can share this happiness with us. * *"
Following this initial contact and subsequent communications Mr. and Mrs. Doe made a formal application on November 28, 1961 for the adoption of the child who is the subject of this proceeding. In due course Mr. and Mrs. Doe attended a pre-adoptive meeting at which the Director and an Assistant of the Adoptive Agency spoke to the prospective adoptive parents and at *472 which time Mr. and Mrs. Doe were told by the Assistant, in the words of Mrs. Doe, that now was the time prior to entering into the actual adoption proceedings to shake the skeletons out of the closet and take inventory of whatever problems they might have. No information was forthcoming at that time concerning any difficulties that might have existed between Mr. and Mrs. Doe, and there is nothing in the record to substantiate any thought that there were any differences at that time. In fact, the Social Worker who performed the background and pre-adoptive study para-phrased very well her conclusions of the actual marital status of this couple during and at the conclusion of her study in the following words:
"They like doing things together but with her working three nights a week and his attending school the two nights she is at home they do not have much opportunity for this except over weekends. Then they visit relatives and friends in Wilmington and Philadelphia, go to the movies, shows, chaperon C.Y.O. dances, help with other Church activities and enjoy romping with their poodle and collie. Mr. Doe likes to read and both attend the Albertson Civic Club once a month.
"Mrs. Doe likes to cook and try out new recipes. He likes to eat what she makes, he likes to build things for the house and she likes to sew.
"When they have disagreements they talk them out. He laughs at her when she gets going and this breaks her up. Both learned long ago not to argue. Mr. Doe said you win nothing by arguing. In a disagreement the emotional components get out of hand. So their sense of humor comes into their disagreements and then they talk them out.
"It is clear to see that this couple have a mutual love and respect for each other and that his strong pull is for his wife and his home while hers is to achieve the home life both want. Yet one is aware that children will enrich this home not because something is lacking in this marriage, but because there is in this marriage and this couple's attitude the awaiting of their complete fulfillment with the advent of their own children."
In the adoptive study which leads to the placement or non-placement of an adoptive child the Case Worker stated in this instance that it was her duty to make a study of the family but that it was not her duty to act in the capacity of an Investigator to uncover hidden facets of the prospective adoptive parents' lives. In making her study she felt that it was clearly understood by all parties concerned, as a result of preliminary interviews and lectures, that all matters pertaining to the family and family life of those who were being considered as adoptive parents should be held out to the Worker in an open and aboveboard manner. At no time during her study was any dissension between Mr. and Mrs. Doe noted, and according to the evidence before me it appears that no serious dissension did in fact exist at that time.
On March 23, 1962 the child who was then ten days old was placed for adoption with Mr. and Mrs. Doe, and thereafter another member of the Adoptive Agency took over the supervision of the child and parents in the adoptive home during the required ensuing year. Immediately following the placement of this child, and specifically on March 23, 1962, Mr. and Mrs. Doe signed an Agreement with the Adoptive Agency in which they agreed among other things as follows:
"We shall work closely with the Adoptive Agency during the supervisory year, keep the Agency advised of any significant changes in our family situation, permit its representative to visit our home, and attend Agency meetings designed to assist us with the adoption."
*473 In the same text the Adoptive Agency through its Director agreed as follows:
"The Adoptive Agency placed a child with Mr. and Mrs. Robert Doe for the purpose of adoption and intends to allow them after a period of supervision to adopt the child legally and thus have the child become the same as their own natural child. We agree to consent to the legal adoption if, after the period of supervision, the above conditions have been filled and if we feel that the adoption will serve the interest of the child.
"We reserve the right to withdraw the child prior to legal adoption if, in our judgment, such removal is warranted and if we feel that the adoption will not be in the best interest of the child."
When this child was first placed in the Doe home Mr. Doe states that it was as though God sent something beautiful to us.
Obviously, this was a happy couple living a fine and normal married life at that time, but the future was to bring forth insurmountable differences between them. During the course of the following year and prior to the obtaining of the consent of the Adoptive Agency this family was subjected to the normal supervision by the Agency Social Worker who was assigned to that particular case. Several home visits were made, and, according to the testimony, there were numerous phone calls and some office visits. At no time during this supervisory period was the Social Worker or anyone else connected with the Adoptive Agency advised of any marital difficulties in the Doe home. There were difficulties, however, which, according to Mrs. Doe, were small ones and which remained small until June of 1963 when, according to her, they all became one big problem. The basis for the difficulties and dissension which arose between them need not be hung on the family clothes line to air. The fact is that there were problems which Mr. Doe contends were caused by his wife and which Mrs. Doe contends were caused by her husband. According to Mr. Doe some discussion was had at this time concerning the advice of consulting a Priest but no one was consulted concerning their difficulties and most particularly the Adoptive Agency was in no way advised of the disagreements between them which ultimately led to their separation in August of that same year. This was the month following the signing of the Final Degree of Adoption on July 26, 1963 which was recommended and consented to by the Adoptive Agency on the basis of all studies and information which they had in hand.
This couple still remains separate and apart although after the institution of these proceedings efforts of reconciliation were made. According to the testimony of Mrs. Doe, she no longer loves her husband and states that whatever love she did have for him prior to June of 1963 was killed by him during the period between that time and August of 1963 when she left him. Her husband on the other hand, claims he still loves his wife and is desirous of a reconciliation. Such a reconciliation appears remote and improbable at this time since the every day experiences of living dictate that if Mrs. Doe's testimony is true there is no hope of reconciling or resurrecting the love for someone which no longer exists.
Mr. Doe, one of the Respondents in this action, has taken the position that he does not oppose the Petition of the Adoptive Agency although his testimony reveals that in fact he has every desire to be reconciled with his wife and to give this child a home wherein he would be raised to maturity by them as a true Father and Mother.
According to Mr. Doe's testimony he considered informing the Adoptive Agency of their marital difficulties prior to the signing of the Final Decree but did not do so because he still loved his wife, did not want to lose their child, and when he asked *474 his wife about discussing the problem with a Priest she objected and stated that she would leave him if he did so.
Mrs. Doe on the other hand, does object to the Petition and very strongly asserts that at no time did she intentionally conceal the difficulties which existed between her and her husband. Mrs. Doe felt that their problems were normal family problems which they could cope with and which they should keep to themselves. It is her contention that she never intentionally misrepresented or concealed any material facts.
At the present time Mrs. Doe and the child are living with her parents in Philadelphia, Pennsylvania, and it should be noted that the child has been in Mrs. Doe's custody since their separation with the exception of a short period of time prior to the preliminary hearing in this matter when the child was in the custody of a third person under an Order of the Family Court, the propriety of which Order was questionable to say the least.
The Respondent, Mary Doe, has moved to dismiss the Petition made by the Adoptive Agency to have the Adoption Decree set aside and her reasons are twofold. First, it is her contention that the Adoptive Agency has no standing in this Court since it is not the real party in interest. This position I regard as being untenable since the Adoptive Agency did have the parental rights in this child during the entire period involved and since the consent of this Organization was required and relied upon by the Court in entering the Final Decree and award allowing the Final Adoption of this child. Secondly, it is her contention that neither she nor her husband defrauded nor misrepresented material facts to the Adoptive Agency, and that no action or inaction on their part constituted fraudulent conduct which would be sufficient in law for the Court to now vitiate this sacred Decree of Adoption. This second contention is a more troublesome one and merits much thought and consideration.
The power of a Court to review and vacate an Adoption Decree on the ground of fraud is almost universally recognized.
"While some Courts have expressed doubt as to the power of a Court to revoke or set aside a prior Order of Adoption, it is generally held or recognized that such Decree may be vacated upon such grounds as would entitle the Court to vacate any other Order or Decree." 2 A.L.R.2d p. 889.
See also 2 C.J.S. Adoption of Children §§ 42-49; and 1 Am.Jur. Adoption § 72.
Although there are no reported Delaware cases precisely on point it has been stated in Delaware that a Court has inherent power to set aside its judgment if the judgments are obtained by fraud or misrepresentation, Miles v. Layton, 8 W. W. Harr. 411, 193 A. 567, 112 A.L.R. 786 (1937) and in the unreported decision in the Orphans Court of the State of Delaware, in and for Sussex County, on a Petition filed September 30, 1952 praying for the revocation of an Adoption Decree of that Court on the ground of fraud and misrepresentation, the Court in its Letter Opinion dated January 30, 1953 stated in part as follows:
"The Petition for revocation of the adoption is based upon fraud and misrepresentation. Our present statute is silent as to the Court's power to grant an annulment. I need not decide whether the Court has such power where the Petition is based upon intrinsic fraud as contrasted with extrinsic fraud or fraud upon the Court. The authorities are uniform in holding that fraud practiced upon a Court is always ground for vacating a judgment. 49 C.J.S. [Judgments § 269, p.] 488. This rule applies to adoptions in Courts like our Orphans Court. State [ex rel. Bradshaw] v. Probate Ct. ([225] Ind. [268]), 73 N.E.2d 769, Cf. Barber v. Barber ([280] Ky. [842]), 134 S.W.2d 933.

*475 "The adoption in this case, in my opinion, should be set aside for what amounts to a fraud upon the Court in entering the original judgment. As was required by the Statute then in force (Ch. 187, Vol. 41, Laws of Delaware 618), the Court's determination that the child was suitable for adoption in this home was based upon the report made to the Court by the State Board of Welfare. It then appeared, and still appears, that this report was based almost entirely upon the investigations and reports made by the Case Worker of the Kentucky Agency. These were accepted by our agency with little investigation on its own part.
"In the Report made to this Court in June 1948, there appear these statements: `The psychological report stated that he is mentally above the average * * * James and his sister have become well adjusted in the home and are gaining real security and a feeling that they really belong. * * * The children are happy and free, well mannered and respond readily to gentle but firm discipline.' The statement concerning the child's mentality was apparently based upon the psychological test given in January 1947. Nothing was brought to the Court's attention at that time concerning the two previous psychological examinations in 1946 which led to different conclusions than the one of January 1947. Perhaps, however, we should not place too much emphasis upon this phase of the matter because of the child's age when these three tests were made. It will suffice to say that, had the Court known of those two prior tests and the results thereof, it no doubt would have suggested further tests and study before entering a final judgment. Likewise, we may assume that the State Board of Welfare would have made a similar suggestion before recommending the Final Decree, had these tests been brought to its attention.
"More important, to my mind, is that part of the report which indicates that the child was adjusting so nicely in its new home and was responding readily to gentle but firm discipline. Uncontradicted evidence now before me shows this statement to have been untrue at the time it was made, that the child was actually not responding to discipline at the time, that it was not adjusting nicely in the home, and that the investigator had been informed of this condition and had seen some of the effects of it on a visit to the home in New Orleans. It may be that the investigator thought these troubles were unimportant or were temporary and would be eliminated by the passage of time. Whatever the reason may have been for failure to do so, the facts should have been brought to the Court's attention. Had this been done, the Court would definitely have declined to sign a final decree until it was satisfied that the situation had been corrected. Concealment of these vital facts, whether resulting from good or bad faith, constituted misrepresentation and fraud upon the Court.
"If the placement had worked out for the best interests of the child, perhaps the Court would be justified in refusing the present application.
"It is recognized that a Final Decree of adoption should be set aside only in a very clear case. Obviously, every family which adopts a child takes certain risks as to the future progress of the child. These are inherent. The fact that such risks exist, however, emphasize the need for full disclosure of all material facts to the Court in the first instance in order that every precaution may be taken to guard against future trouble, not only for the protection of the adopting parents but especially for the protection of the child. The reasons for this are obvious and need no elaboration."
*476 In deciding the case before me at this time I adopt the same reasoning set forth by the Court at that time. In my opinion, the failure on the part of the Respondents to disclose their marital difficulties after they became major ones during the summer of 1963 prior to the signing of the Final Decree of Adoption would have caused the Adoptive Agency to withhold its consent and, therefore, would have resulted in a postponement and possibly an ultimate denial of the Final Decree. The consent of the Adoptive Agency was a pre-requisite to the Court's issuance of its Final Decree, and, therefore, the failure on the part of the Respondents to disclose information which they knew or should have known would have caused the withdrawal of the consent by the Adoptive Agency constitutes fraud sufficient to cause this Court to revoke its Decree.
The question then which is of most importance is whether the best interest of the adopted child, John Doe, would be best served at this time by revoking or not revoking the Adoption Decree.
After listening to the testimony of the Doctors who are both known and respected authorities in the State of Delaware in infant psychology, and after listening to the testimony of the maternal Grandmother in whose home the child is now residing and the testimony of all other witnesses I cannot help but feel that the love of Mrs. Doe for this child and, in fact, the love of Mr. Doe as well is very strong. I also consider the evaluation of the child's progress as an indication that this child has been extremely well cared for and that he might very well continue his growth toward maturity in a perfectly normal and positive manner. The decision as to what is in the best interest of the child is a most difficult one and, in any event, must be based to some degree on conjecture and speculation as to what the future might hold in store for this child. Were this an older child my feeling might be contrary to my present feeling, but at this time I am of the opinion that it would be to the best interest of this child to revoke the adoption and to return the child to the Adoptive Agency for replacement in an undivided home where this child would on the outset during his young immature life have the benefit of a Father and Mother.
An Order will be entered accordingly.